## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Larry L. Wright and**
**Gary L. Jones,**

        **Plaintiffs,**

**v.**                              **Case No. 07-2197-JWL**

**C&M Tire, Inc.,**

        **Defendant.**

## MEMORANDUM & ORDER

Plaintiffs, both formerly employed at defendant's Kansas City, Kansas facility, filed suit against defendant alleging violations of 42 U.S.C. § 1981 and the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq. This matter is presently before the court on defendant's motion for summary judgment on all claims (doc. 36). The court grants in part and denies in part the motion. As will be explained, a trial is required on Mr. Wright's and Mr. Jones' racial harassment claims; Mr. Jones' discriminatory discharge, discriminatory failure-to-train and discriminatory discipline claims (limited to his August 2005 and January 2006 discriminatory warnings); Mr. Jones' retaliation claim; and plaintiffs' claims for punitive damages. The court grants summary judgment on all other claims.[1]

---

[1]Plaintiffs recently filed a motion for leave to file a surreply (doc. 48) on the summary judgment briefing. The court has reviewed the proposed surreply submitted with the motion and denies the motion. The surreply concerns three discrete issues–all of which have been decided in plaintiffs' favor at this juncture regardless of the additional arguments set forth by plaintiffs in the surreply.

## I.      Facts

The following facts are uncontroverted or related in the light most favorable to plaintiffs, the nonmoving parties.  Defendant services, retreads and sells commercial truck tires and operates through various service centers and retread facilities.  Plaintiffs, both African-American males, worked for defendant at defendant's Kansas City, Kansas retread facility as tire retread technicians.  Defendant's Kansas City, Kansas retread facility is comprised of two parts–the retread shop and the warehouse.  During all times relevant to this lawsuit, John Rhoads supervised the retread shop employees, including plaintiffs, and Mr. Rhoads, in turn, reported to the Retread Production Manager, Doug Perkins.  Other management personnel during the relevant time included Libby Wiseman, defendant's Human Resources Manager; Vic Stimach, the Facility Manager who directly supervised the warehouse employees; Harold Hefflin, defendant's Operations Manager; and Greg Trum, defendant's President.

Plaintiff Larry Wright initially worked for defendant beginning in 1999.  In 2002, Mr. Wright voluntarily ceased his employment with defendant to return to work with a prior employer.  At the time he left his employment with defendant, Mr. Wright was earning $12.45 per hour as the Lead Man in the retread shop.  In July 2004, defendant rehired Mr. Wright as a retread technician at $11.00 per hour.  The record reflects that the Lead Man position was not available at that time or at any time after Mr. Wright was rehired.  That position was filled by Mark Robinson, a Caucasian, during all times relevant to this lawsuit.  Mr. Wright contends that Mr. Rhoads, at the time Mr. Wright was rehired in July 2004, promised Mr. Wright that his hourly rate would be increased to $12.45 in approximately six months.  Although Mr. Wright

2

did receive incremental raises over the course of his employment, his hourly rate was never increased to $12.45.

In November 2004, Mr. Wright received a ninety-day performance review and, at that time, Mr. Wright reminded Mr. Rhoads about his promise to increase Mr. Wright's hourly rate to $12.45. According to Mr. Wright, Mr. Rhoads assured Mr. Wright that the raise would occur "by early 2005." Mr. Wright also requested, during his ninety-day review, that he be sent to Muscatine, Iowa to complete the Master Craftsman C.R.T. course. Completion of the course resulted in an automatic wage increase of $.50 per hour and Mr. Rhoads had the authority to select which employees would be sent to the course. Mr. Rhoads never selected Mr. Wright and Mr. Wright never completed the course. During this time frame, the latter part of 2004, Mr. Wright alleges that Mr. Rhoads began telling racial jokes in the workplace and that he frequently used the word "nigger" in the telling of these jokes. According to Mr. Wright, Mr. Rhoads told racial jokes on a weekly basis. Mr. Rhoads denies ever using the word "nigger," averring that his daughter-in-law and grandchildren are African-American and that he finds the word "repulsive."

In December 2004, plaintiff Gary Jones began his employment with defendant. In March 2005, Mr. Wright overheard Mr. Rhoads tell Mr. Jones that "niggers are too stupid to do inspections." While the record is unclear as to the timing of his complaint, Mr. Wright testified that he complained to Mr. Rhoads about his use of racial slurs and his telling of racial jokes but that Mr. Rhoads' conduct continued. In October 2005, Mr. Wright walked into the facility office and overheard Mr. Rhoads having a discussion with Mr. Stimach about another African-

3

American retread technician and, according to Mr. Wright, Mr. Rhoads stated, "Niggers can't do the work."  Shortly thereafter, Mr. Wright contends that he complained to Mr. Perkins and Mr. Hefflin about Mr. Rhoads' use of racial slurs and telling of racial jokes.  Shortly after his complaint, Mr. Rhoads allegedly confronted Mr. Wright about his complaint, stating that Mr. Trum had talked to him and advising Mr. Wright that "whatever you say to him, I'm going to hear about it."

In November 2005, Mr. Rhoads, in the context of responding to a work-related question from Mr. Jones, allegedly expressed frustration at Mr. Jones' "stupidity" and stated to Mr. Jones, "That's the reason I won't cross-train you, you dumb, stupid nigger."  Mr. Wright overheard the comment and testified that this was the first occasion that he had heard Mr. Rhoads use a racial slur "because he was mad."  On another occasion, after Mr. Jones had expressed an interest in transferring to the warehouse side of the facility, Mr. Stimach approached Mr. Rhoads about the potential transfer and, according to Mr. Jones, who testified that he overheard the conversation, Mr. Rhoads told Mr. Stimach, "That nigger ain't going nowhere."  Shortly after Mr. Rhoads' alleged "stupid nigger" comment, Mr. Jones reported Mr. Rhoads' use of the word "nigger" to Mr. Stimach and Ms. Wiseman.  Although Ms. Wiseman discussed the complaint with Mr. Rhoads, she did not conduct any further investigation and no meaningful action was taken on the part of defendant.  Indeed, according to Mr. Jones, shortly after his complaint to Ms. Wiseman, Mr. Rhoads confronted Mr. Jones about his complaint, stating "I ought to teach you about going to Human Resources on me."

On January 10, 2006, Mr. Rhoads issued Mr. Jones an oral warning relating to slow

4

production and his inadequate operation of the chambers–the part of the retreading process wherein retreaded tires are cured by placement in a chamber where pressure and temperature adhere the tread to the tire. While the nature of the oral warning is not entirely clear, it appears that Mr. Jones was criticized for failing to load and start the chambers in a timely fashion. On January 26, 2006, Mr. Rhoads terminated Mr. Jones' employment for failing to start two chambers as scheduled after those chambers were loaded, thereby slowing production for the day. According to Mr. Jones, Mr. Rhoads' purposefully failed to train Mr. Jones concerning the proper operation of the chambers (and did so based on Mr. Jones' race).

During this same time frame, Mr. Wright applied for and received a medical leave of absence. Mr. Wright did not return to work after the expiration of his medical leave and his employment was terminated in July 2006. He contends that Ms. Wiseman failed to adequately assist him with respect to his claim for short-term disability benefits by failing to provide him with a short-term disability claim form within thirty days of his request.

Additional facts will be related, as necessary, in connection with the court's analysis of defendant's motion and plaintiffs' particular claims.


## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Lifewise Master*

*Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004). An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant. *Id.* (citing Fed. R. Civ. P. 56(e)). To accomplish this, sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive

6

determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

### III.   Mr. Jones' Employment Application and his Section 1981 Claims

The court addresses first a threshold issue concerning Mr. Jones' section 1981 claims. It is uncontroverted that Mr. Jones misrepresented his criminal history when applying for his position with defendant. Specifically, Mr. Jones represented on his application that he had never been convicted of a crime and he certified that the information provided in his application was true, complete and correct. In fact, Mr. Jones has been convicted of third-degree assault arising out of a domestic dispute with his spouse and has been convicted of possessing a controlled substance, crack cocaine. Defendant's owner has averred that defendant would never have hired Mr. Jones if it had known of his conviction for assault.[2] Defendant, then, contends that Mr. Jones' misrepresentations were material, thereby rendering voidable the employment contract underlying Mr. Jones' section 1981 claims and precluding Mr. Jones from maintaining any section 1981 claims based upon that contract. *See Wilson v. Wesley Med. Ctr.*, 2002 WL 31163590, at *4 (D. Kan. Aug. 28, 2002) (section 1981 claim must rest on a valid contract and if the contract is void or voidable at the other party's option, then it cannot form the basis of a cognizable section 1981 claim).

Assuming without deciding that the court would extend its decision in *Wilson* to the employment context, the court nonetheless denies defendant's motion on this issue based on the

---

[2]Defendant does not speak to whether Mr. Jones' drug conviction would have had any bearing on his employability.

existence of material disputed facts concerning whether defendant would have hired Mr. Jones even if it knew about his assault conviction. While defendant's current owner avers that defendant would not have hired Mr. Jones, Mr. Rhoads' deposition testimony suggests that defendant has treated convictions stemming from domestic violence differently from convictions for "violent crimes." According to Mr. Rhoads, he would not hire an individual who had been convicted of a "violent crime," but he had never disqualified an applicant based on a conviction involving domestic violence. While defendant highlights that Mr. Rhoads does not have the authority to hire employees without approval, his testimony nonetheless raises a factual issue concerning defendant's hiring practices.

## IV.    Plaintiffs' Racial Harassment Claims

Both plaintiffs allege that Mr. Rhoads' alleged conduct toward plaintiffs and other African-American employees created a hostile working environment in violation of section 1981. With respect to Mr. Wright's claim, defendant asserts that summary judgment is appropriate because it cannot be held liable for any harassment of Mr. Wright by Mr. Rhoades in light of the affirmative defense recognized by the Supreme Court in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). With respect to Mr. Jones' claim, defendant asserts that summary judgment is appropriate because Mr. Jones cannot establish racial harassment that was sufficiently severe or pervasive. As will be explained, the harassment claims of both plaintiffs must be resolved by a jury.

A.    *Employer Liability/Mr. Wright's Claim*

Defendant moves for summary judgment on Mr. Wright's claim of racial harassment pursuant to the *Faragher/Ellerth* affirmative defense.  In other words, defendant maintains that summary judgment is warranted against Mr. Wright because the harassment did not culminate in a tangible employment action against him; defendant exercised reasonable care to prevent and correct promptly any racial harassment in the workplace; and plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided to him by defendant. *See Ellerth*, 524 U.S. at 765; *McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1139 (10th Cir. 2006).  According to defendant, it is undisputed that Mr. Rhoads' alleged conduct did not culminate in a tangible employment action; defendant's written anti-harassment policy and complaint procedure is sufficient to establish that it exercised reasonable care to prevent harassment in the workplace; and Mr. Wright acknowledges that he did not report any alleged harassment to management or to defendant's personnel department.

Defendant's motion is denied.  Even assuming, as defendant asserts, that Mr. Wright did not suffer a tangible employment action such that the defense is available to defendant,[3] and further assuming that defendant's anti-harassment policy is sufficient to establish the first

_____

[3]Mr. Wright contends that the defense is unavailable because Mr. Rhoads' alleged harassment of Mr. Wright culminated in a tangible employment action, including failing to follow through on his promise to raise Mr. Wright's hourly wage; issuing unjustified disciplinary warnings to Mr. Wright; and refusing Mr. Wright's request to be sent to Iowa so that he could complete his Master Craftsman C.R.T. course.  The court need not decide whether these actions constitute tangible employment actions because it denies defendant's motion even assuming that the defense is available.

element of the defense,[4] genuine issues of material fact exist with respect to whether Mr. Wright

unreasonably failed to take advantage of corrective opportunities provided to him by defendant.

Contrary to defendant's characterization of the record evidence, Mr. Wright testified that he

complained in October 2005 about Mr. Rhoads' use of racial slurs and telling of racial jokes to

Doug Perkins and Harold Hefflin.[5]   The record reflects that Mr. Perkins has supervisory

authority over Mr. Rhoads and that Mr. Hefflin is defendant's operations manager.   In light of

such evidence, defendant has not shown that it is entitled to summary judgment on its affirmative

defense.   *See Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1228 (10th Cir. 2000) (an

employer is entitled to judgment as a matter of law under the *Faragher/Ellerth* affirmative

defense "only if the evidence points but one way and is susceptible to no reasonable inferences

---

[4]Mr. Wright contends that genuine issues of fact exist with respect to whether defendant exercised reasonable care to prevent and correct promptly any racially harassing behavior because defendant knew that Mr. Rhoads was engaging in racially harassing behavior and failed to do anything about it.  As with the issue of whether Mr. Wright suffered a tangible employment action, the court declines to address this issue because it denies defendant's motion in any event.

[5]Defendant suggests that Mr. Wright contradicted himself in his deposition, first testifying that he did not complain to management about Mr. Rhoads' alleged conduct and then, after taking "recesses" in the deposition and in response to "leading" questions from his counsel, testifying that he did complain to management about Mr. Rhoads.  The court rejects defendant's suggestion.  The testimony relied upon by defendant in an effort to establish that Mr. Wright did not complain to management focused solely on whether Mr. Wright discussed with management his belief that defendant's anti-harassment policy had been violated and Mr. Wright's answers to questions concerning the policy reflect that he was limiting those answers to discussions with management about defendant's handbook or specific policies.  In contrast, when Mr. Wright was asked direct questions by his counsel concerning whether he had complained to management about Mr. Rhoads' alleged conduct, Mr. Wright testified–consistent with the initial allegations in his complaint–that he complained to management about Mr. Rhoads' behavior.  In short, the court discerns no contradiction in Mr. Wright's testimony.

supporting" the opposing party); *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3rd Cir. 2000) (defendant may prevail on its affirmative defense at the summary judgment stage only if it proves its affirmative defense "so clearly that no rational jury could find to the contrary."); *see also Walker v. United Parcel Serv. of Am., Inc*., 2003 WL 22101491 (10th Cir. Sept. 11, 2003) (employer not entitled to summary judgment on affirmative defense where plaintiff had complained previously about harassment). As defendant has not otherwise moved for summary judgment on the merits of Mr. Wright's harassment claim, a trial is required on this claim.

B.      *Severe and Pervasive Conduct/Mr. Jones' Claim*

With respect to Mr. Jones' racial harassment claim, defendant asserts that Mr. Jones cannot establish that he suffered harassment sufficiently severe and pervasive to alter the conditions of Mr. Jones' employment and create an abusive working environment. To survive defendant's motion for summary judgment on this claim, Mr. Jones must show "that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Herrera v. Lufkin Indus., Inc*., 474 F.3d 675, 680 (10th Cir. 2007) (quoting *Sandoval v. City of Boulder*, 388 F.3d 1312, 1326-27 (10th Cir. 2004)). He must also show that he was "targeted for harassment" because of his race. *Id*.

In support of its motion for summary judgment, defendant contends that summary judgment is warranted because Mr. Jones alleges only that he was subjected to two racial remarks during the course of his one-year employment–the March 2005 comment that "niggers

11

are too stupid to do inspections" and the November 2005 comment in which Mr. Rhoads allegedly called Mr. Jones a "dumb, stupid nigger" in the context of explaining to Mr. Jones why he would not cross-train Mr. Jones.  Defendant, then, asserts that these two comments, as a matter of law, are insufficient to constitute a racially hostile work environment.  *See id.* ("A plaintiff does not make a showing of a pervasively hostile work environment by 'demonstrating a few isolated incidents of racial enmity or sporadic racial slurs.  Instead, there must be a steady barrage of opprobrious racial comments." (quoting *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005))).

In response, Mr. Jones clarifies that he is relying on one additional overtly racial remark in which he overheard Mr. Rhoads talking to Mr. Stimach about Mr. Jones' desire to transfer to the warehouse and Mr. Rhoads allegedly stated, "That nigger ain't going nowhere."  Mr. Jones further relies on the Tenth Circuit's *Herrera* decision for the principle that facially neutral abusive conduct can support a finding of racial animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly racially-discriminatory conduct."  *Id*. at 682 n.7.   According to Mr. Jones, his working environment included facially neutral abusive conduct by Mr. Rhoads, including Mr. Rhoads' refusal to train Mr. Jones despite training given to Caucasian employees; Mr. Rhoads' issuance of unjustified and trumped-up disciplinary warnings; and Mr. Rhoads' issuance of a low performance evaluation.

Significantly, defendant, in its reply, does not address in any respect Mr. Jones' reliance on *Herrera* or the "neutral" conduct highlighted by Mr. Jones.  It does not even address the

12

additional race-based remark relied upon by Mr. Jones.   Indeed, defendant, in only two

sentences, simply reiterates that "two instances" fall short of the requisite "steady barrage" of

racial remarks.  In the absence of any argument from defendant, the court concludes that Mr.

Jones is entitled to have a jury resolve his racial harassment claim.   While the overtly racial

remarks alleged by Mr. Jones are few in number, the fact that those alleged remarks directly

relate to Mr. Jones' job performance and, more specifically, to Mr. Rhoads' purported refusal

to train Mr. Jones, renders Mr. Jones' assertions concerning Mr. Rhoads' "neutral" conduct that

much more compelling.  On two occasions, Mr. Rhoads allegedly referred to Mr. Jones using

a racial slur while at the same time expressly refusing to cross-train Mr. Jones and expressly

refusing to permit him to do inspections.  In the court's view, the facially neutral conduct

highlighted by Mr. Jones–including Mr. Rhoads' alleged refusal to train Mr. Jones and the

allegedly trumped-up disciplinary warnings that, viewed most favorably to Mr. Jones, stem from

Mr. Jones' lack of training–becomes all the more relevant because the totality of the evidence

permits an inference that the "neutral" conduct was, in fact, based on Mr. Jones' race.  Summary

judgment, then, is denied on this claim.  *See Herrera*, 474 F.3d at 682 (facially neutral conduct

contributing to racially hostile environment included evidence that supervisor treated plaintiff

worse than he treated other employees).

**V.    Plaintiffs' Disparate Treatment Claims**

The court turns, then, to plaintiffs' disparate treatment claims.[6]  In his summary judgment briefing, Mr. Wright identifies three adverse actions that he contends he suffered as a result of his race:  Mr. Rhoads' failure to follow through on his promise to raise Mr. Wright's hourly rate to $12.45; Mr. Rhoads' failure to grant Mr. Wright's request to go to Muscatine, Iowa to complete the Master Craftsman course; and Mr. Rhoads' issuance of two disciplinary warnings. The record reflects, however, that Mr. Wright's claims concerning his pay raise and the Master Craftsman course were asserted for the first time in his summary judgment response.  Indeed, defendant contends in its reply brief that these claims were not alleged in the pretrial order or in supplemental discovery responses served after the entry of the pretrial order–responses that expressly limited Mr. Wright's disparate treatment claims to the disciplinary warnings he received and Mark Robinson's more favorable treatment with respect to compensation and promotion.  The court, then, construes this portion of Mr. Wright's summary judgment response as a request to amend the pretrial order, *see Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir.

---

[6]In their summary judgment response, plaintiffs emphasize that they are relying on a "mixed motive" theory of proof such that they are not required to show pretext or follow the more traditional *McDonnell Douglas* analysis.  Defendant objects to this approach on the grounds that, according to defendant, plaintiffs failed to preserve the theory in the pretrial order and have waived it.  The court rejects this argument for two reasons.  First, the court believes that plaintiffs' use of the phrase "motivating factor" throughout the pretrial order indicates a clear intent to proceed pursuant to the "mixed motive" theory.  Second, the court is not convinced that a plaintiff would be required to "preserve" in a pretrial order the specific evidentiary framework under which he or she believes his evidence should be analyzed.  *See Fye v. Oklahoma Corp. Commission*, 516 F.3d 1217, 1225 (10th Cir. 2008) (a plaintiff need not characterize her case as a mixed-motive or pretext case from the outset; although the distinction is critical on appellate review, at the district court level a plaintiff must simply persuade the factfinder either that the evidence shows retaliation or discrimination was a "motivating factor" in the decision or that it shows the employer's reason for the decision is unworthy of belief).

2003) (inclusion of new allegations in a response to a motion for summary judgment should be considered a request to amend the complaint), and denies the request at this late stage of the litigation when discovery has closed.  *See id.* at 1212 (district court did not abuse discretion in refusing to permit plaintiff to amend complaint at summary judgment stage where discovery had closed).

With respect to the disciplinary warnings issued by Mr. Rhoads, Mr. Wright asserts that Mr. Rhoads was motivated by Mr. Wright's race when he issued those warnings to Mr. Wright, one in April 2005 and one in December 2005.  Defendant moves for summary judgment on this claim on the grounds that the disciplinary warnings do not constitute "adverse employment actions" within the meaning of the Tenth Circuit's discrimination jurisprudence.  *See Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (to establish a prima facie case of disparate treatment, plaintiff must establish, among other things, that he suffered an adverse employment action); *Gudenkauf v. Stauffer Communications, Inc.*, 158 F.3d 1074, 1078 (10th Cir. 1998) (in a mixed motive case, plaintiff still required to establish that he or she suffered an adverse employment action).  Mr. Wright does not respond to this argument in any respect and the court agrees with defendant that the uncontroverted evidence demonstrates that the warnings received by Mr. Wright do not rise to the level of adverse employment actions.

Only "acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits" will rise to the level of an adverse employment action. *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1222 (10th Cir. 2006); *see also Piercy*

*v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (*Burlington Northern* "had no . . . effect on our discrimination jurisprudence"). There is no evidence in the record suggesting that the April 2005 written warning or the December 2005 oral warning had any effect on Mr. Wright's employment status. The April 2005 warning concerned Mr. Wright's allegedly making a repair on a tire that did not comport with the customer's specifications and the December 2005 oral warning concerned Mr. Wright's alleged failure to remove an "injury" in a tire before patching the tire. It is undisputed that no further action was taken with respect to either warning, that the warnings had no bearing on Mr. Wright's wages, and that Mr. Wright continued his employment until he went on medical leave.  *See Medina v. Income Support Div., State of New Mexico*, 413 F.3d 1131, 1137 (10th Cir.2005) (warning letter did not constitute adverse employment action where letter did not adversely affect the terms or conditions of the plaintiff's employment; letter did not affect the likelihood that the plaintiff would be terminated, did not undermine the plaintiff's current position and did not affect the plaintiff's future employment opportunities).  In the absence of any evidence (and, indeed, any argument from Mr. Wright) that the disciplinary warnings issued by Mr. Rhoads adversely affected the terms and conditions of Mr. Wright's employment in any respect, summary judgment is granted on this claim.

Mr. Jones, in his summary judgment response, identifies four adverse actions that he contends he suffered as a result of his race: Mr. Rhoads' issuance of various disciplinary warnings; Mr. Rhoads' failure to properly train Mr. Jones on the operation of the chambers; Mr. Rhoads' issuance of a low performance evaluation to Mr. Jones; and Mr. Rhoads' termination of Mr. Jones' employment.  With respect to his claim concerning his low performance

evaluation, the record reflects that this claim was asserted for the first time in Mr. Jones' summary judgment response.  As explained in more detail above in connection with similar claims asserted by Mr. Wright, the court construes Mr. Jones' response as a request to amend the pretrial order to include this claim and denies the request.  Summary judgment on this claim, then, is warranted.

With respect to the disciplinary warnings issued by Mr. Rhoads, the record reflects that Mr. Jones received four such warnings–one in August 2005 concerning his leaving the workplace before loading and "hanging" two chambers, thereby putting the shop behind schedule for the following day; one in September 2005 concerning eating in the shop work area; one in November 2005 concerning an unexcused absence; and one in January 2006 concerning his inadequate operation of the chambers area.  Defendant argues, and the court agrees. that the September 2005 warning and the November 2005 warnings do not constitute adverse employment actions within the context of this case.  There is simply no evidence that these warnings had any bearing on Mr. Jones' employment status or that they factored into Mr. Jones' discharge in any respect.  Based on the authorities set forth above in connection with Mr. Wright's disparate treatment claims, the court grants summary judgment with respect to these claims.

Defendant, however, also contends that the August 2005 and January 2006 warnings do not constitute adverse employment actions and that Mr. Rhoads' failure to train Mr. Jones concerning the operation of the chambers do not constitute adverse employment actions. Viewing the evidence in the light most favorable to Mr. Jones, however, a reasonable jury could

conclude that the two disciplinary warnings and Mr. Rhoads' failure to train Mr. Jones, taken together, placed Mr. Jones' continued employment at risk.  According to Mr. Jones' evidence, Mr. Rhoads refused to train Mr. Jones on the proper operation of the chambers, then disciplined Mr. Jones for his purported failure to properly operate the chambers, then terminated Mr. Jones' employment for his continued failure to properly operate the chambers.  In short, factual issues exist with respect to whether the two disciplinary warnings concerning operation of the chambers and Mr. Rhoads' purported failure to train Mr. Jones on the operation of the chambers were sufficiently tied to Mr. Jones' discharge such that they constitute adverse employment actions. *See Haynes*, 456 F.3d at 1224-25 (warning may be an adverse action if it places plaintiff in an at-risk status).[7]

For similar reasons, Mr. Jones' claims concerning his disciplinary warnings, Mr. Rhoads' failure to train him properly and his discharge ultimately require resolution by a jury.  Not only does Mr. Jones' evidence reflect that his lack of training, disciplinary warnings and discharge were all related, but his evidence, if credited, shows that these actions were tied to his race. Viewed in the light most favorable to Mr. Jones, the evidence supports an inference that Mr. Rhoads expressly refused to cross-train Mr. Jones in other areas on the grounds that he was a

---

[7]Defendant also contends that Mr. Jones cannot establish a prima facie case with respect to his failure-to-train claim because he has identified no similarly situated employees who were treated more favorably with respect to training.  The Tenth Circuit, however, has repeatedly cautioned that comparison to similarly situated employees is not necessarily required as part of a plaintiff's prima facie case and that the relevant prima facie element may be framed much more broadly, requiring only a "showing of circumstances giving rise to an inference of discrimination."  *See Sorbo v. United Parcel Serv*., 432 F.3d 1169, 1173 (10th Cir. 2005) (collecting cases).  The court, then, rejects this argument.

"stupid nigger."  The evidence further reflects Mr. Rhoads' expression that "niggers" were not capable of doing the same work as non-African-American employees.  From these remarks and Mr. Jones' evidence concerning his lack of training, a jury could reasonably infer that Mr. Rhoads purposefully failed to train Mr. Jones on the basis of his race, then disciplined him for not knowing how to perform a task on which he had been denied training (again, because of race), and then terminated his employment for not knowing how to perform a task on which he had been denied training because of his race.  Mr. Jones has presented sufficient evidence demonstrating the existence of a genuine issue of material fact pertaining to whether Mr. Jones' race actually motivated Mr. Rhoads' allegedly discriminatory conduct.  *See Stover v. Martinez*, 382 F.3d 1064, 1077-78 (10th Cir. 2004) (to demonstrate discriminatory animus, remarks must have some nexus to the disputed employment decision); *Danville v. Regional Lab Corp*., 292 F.3d 1246, 1251 (10th Cir. 2002) (ageist remark permitted an inference of discriminatory intent because there was evidence from which jury could conclude that the remark was intended to explain why the specific employment decision was made).

## VI.    Retaliation Claims

Both plaintiffs assert claims of retaliation, asserting that they suffered adverse employment actions as a result of their complaints of racial harassment.  To survive defendant's motion, plaintiffs must present sufficient evidence from which a reasonable jury could conclude that retaliation was a motivating factor in the adverse actions or from which a jury could reasonably conclude that defendant's proffered reasons for its actions are unworthy of belief.

*See Fye v. Oklahoma Corp. Commission*, 516 F.3d 1217, 1225 (10th Cir. 2008).

A.      *Mr. Wright's Claim*

In its motion for summary judgment, defendant first asserts that Mr. Wright's claims cannot withstand summary judgment because he cannot establish that Mr. Rhoads or Ms. Wiseman–the only individuals who allegedly retaliated against Mr. Wright–had any knowledge of Mr. Wright's complaints and that, as a result, the requisite causal connection does not exist.[8] *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1235 (10th Cir. 2000) (affirming dismissal of retaliation claim on summary judgment where plaintiff presented no evidence that decisionmaker knew of plaintiff's protected activity at time discharge decision was made); *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 534 (10th Cir. 1998) (same).[9]  While Mr. Wright contends that Ms. Wiseman retaliated against plaintiff by failing to assist him with respect to his claim for insurance benefits, Mr. Wright does not controvert that Ms. Wiseman did not know that Mr. Wright had raised concerns about harassment or discrimination until she received a copy of Mr. Wright's complaint in this lawsuit.  As such, Mr. Wright's retaliation claim concerning Ms. Wiseman cannot survive summary judgment.

_____

[8]Defendant also contends that Mr. Wright did not engage in protected activity because he never complained about Mr. Rhoads' conduct.  As explained in connection with defendant's assertion of the *Faragher/Ellerth* defense to Mr. Wright's harassment claim, however, there is evidence that Mr. Wright complained to management about Mr. Rhoads' alleged conduct.  This argument, then, is rejected.

[9]Indeed, Mr. Wright, in his summary judgment response, does not address his retaliation claim concerning Ms. Wiseman and, thus, has abandoned that claim in any event.

In contrast, Mr. Wright has come forward with evidence that Mr. Rhoads knew about plaintiff's complaints. First, Mr. Wright testified that, shortly after he complained to Mssrs. Perkins and Hefflin about Mr. Rhoads' alleged conduct, Mr. Rhoads advised Mr. Wright that he had learned from Greg Trumm, defendant's owner, that Mr. Wright had complained about him. While defendant might dispute the nature of the complaint referenced by Mr. Rhoads (contending that the complaint did not encompass race-based conduct), Mr. Wright's testimony is sufficient to create a factual issue. In any event, viewing Mr. Wright's deposition testimony in the light most favorable to Mr. Wright, a reasonable jury could infer that Mr. Wright complained directly to Mr. Rhoads about his use of racial slurs. Defendant, then, has not shown that it is entitled to summary judgment on the issue of Mr. Rhoads' knowledge of Mr. Wright's protected activity.[10]

---

[10]In one sentence of its brief, defendant contends that Mr. Wright "cannot claim he was subjected to adverse employment actions consisting of unequal pay raises, denial of promotional opportunities, inadequate training and unjustified discipline" and simply incorporates by reference its purported discussion of this argument in connection with Mr. Wright's disparate treatment claims. The court declines to address the substance of this argument for two reasons. First, defendant never argues in connection with Mr. Wright's disparate treatment claims that unequal pay raises, denial of promotional opportunities or inadequate training do not constitute adverse employment actions; thus, with respect to these actions, there is simply no argument for the court to refer to in connection with Mr. Wright's retaliation claims. Second, although defendant does argue that the disciplinary warnings received by Mr. Wright do not constitute adverse employment actions for purposes of his disparate treatment claims, defendant does not address in any respect whether and how the analysis would be the same for purposes of Mr. Wright's retaliation claims under which a different (and more liberal) standard would apply. *See Piercy v. Maketa*, 480 F.3d 1192, 1203 n.12 (10th Cir. 2007) (noting that the Supreme Court in *Burlington Northern* applied a more lenient standard with respect to the contours of adverse employment actions in analyzing the anti-retaliation provisions of Title VII, but that the more stringent standards for adverse actions set forth in the Circuit's discrimination jurisprudence remained the same).

Ultimately, in an effort to survive defendant's motion for summary judgment, Mr. Wright relies on the Tenth Circuit's decision in *Marx v. Schnuck Markets, Inc*., 76 F.3d 324, 329 (10th Cir. 1996), for the principle that "protected conduct closely followed by adverse action may justify an inference of retaliatory motive."[11]  According to Mr. Wright, the evidence in this case demonstrates a "close temporal proximity" between Mr. Wright's protected conduct and the adverse actions that he suffered, including Mr. Rhoads' failure to follow through on his promise to raise Mr. Wright's hourly rate by early 2005, Mr. Rhoads' issuance of the disciplinary warnings in April 2005 and December 2005, and Mr. Rhoads' failure to grant Mr. Wright's November 2004 request to go to Iowa to complete his Master Craftsman C.R.T. course.  Mr. Wright further contends that this close temporal proximity, coupled with Mr. Rhoads' racist remarks, is sufficient to permit a jury to infer a retaliatory motive.

The court disagrees.  Critically, this portion of Mr. Wright's summary judgment response expressly limits Mr. Wright's protected conduct to a complaint allegedly asserted by Mr. Wright to Mr. Rhoads himself, a complaint which, according to Mr. Wright's submissions, was made "during the latter part of 2004."  Mr. Wright, however, directs the court to no evidence supporting his assertion that he complained to Mr. Rhoads in "the latter part of 2004."  While

---

[11]While Mr. Wright purports to rely on a "mixed motive" theory of proof in connection with his retaliation claim, he relies on *Marx* as well as *Annett v. University of Kansas*, 371 F.3d 1233, 1240 (10th Cir. 2004), and *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).  Both *Annett* and *Anderson*, however, quite clearly follow the *McDonnell-Douglas* order of proof.  In any event, as requested by Mr. Wright, the court applies the principle set forth in these cases regardless of whether that principle is deemed to comport with a "mixed motive" theory as plaintiff suggests or the *McDonnell-Douglas* theory.

22

Mr. Wright's Statement of Fact No. 116 supports the inference that Mr. Wright complained to

Mr. Rhoads about his use of racial slurs, that factual statement does not contain any support

concerning the timing of that complaint and Mr. Wright directs the court to no other evidence

that would support a finding that the complaint was made in the latter part of 2004.  In light of

the complete absence of any evidence concerning the timing of Mr. Wright's complaint to Mr.

Rhoads,[12] Mr. Wright's reliance on the "close temporal proximity" of his complaint to the

adverse actions is misplaced and his effort to establish a retaliatory motive by virtue of that

purported proximity fails.  Summary judgment in favor of defendant, then, is warranted on Mr.

Wright's retaliation claim.


B.    *Mr. Jones' Claim*

        The court turns, then, to Mr. Jones' retaliation claim.  Mr. Jones asserts that Mr. Rhoads

issued two unjustified disciplinary warnings (November 2005 and January 2006) and terminated

Mr. Jones' employment in retaliation for Mr. Jones' November 2005 complaint to Ms. Wiseman.

According to defendant, Mr. Jones cannot survive summary judgment because the

uncontroverted facts demonstrate that Mr. Rhoads–the only individual who allegedly retaliated

against Mr. Jones–had no knowledge that Mr. Jones had raised complaints of race-based

conduct.  The court disagrees.  Mr. Jones testified that Mr. Rhoads referred to him as a "stupid

---

[12]It is not surprising that Mr. Wright elected not to focus on his October 2005
complaint to Mssrs. Perkins and Hefflin as that complaint was made long after the majority
of the adverse actions relied upon by Mr. Wright.  *See Fasold v. Justice*, 409 F.3d 178, 195
(10th Cir. 2005) ("The essence of protected activity is that it take place prior to the adverse
employment action.").

nigger" on November 10, 2005 and that he complained to Ms. Wiseman about the remark on November 11, 2005.  According to Mr. Jones, shortly after he raised his complaint with Ms. Wiseman, Mr. Rhoads approached him in the workplace and stated, "I ought to teach you about going to Human Resources on me."  A reasonable jury could conclude, if it credited Mr. Jones' testimony about Mr. Rhoads' comment, that Ms. Wiseman had advised Mr. Rhoads that Mr. Jones had complained about the racial slur allegedly made by Mr. Rhoads.  While defendant emphasizes its evidence reflecting that Mr. Jones complained only about Mr. Rhoads "bad temper" and that he did not raise any issues concerning racial slurs or race-based conduct, defendant ignores that the court, at this juncture, must view the evidence in the light most favorable to Mr. Jones and cannot weigh defendant's evidence against Mr. Jones' deposition testimony.  In short, because genuine issues of material fact exist with respect to whether Mr. Rhoads had knowledge of Mr. Jones' protected activity, defendant is not entitled to summary judgment on this issue.[13]

The court also concludes that Mr. Jones has come forward with evidence from which a reasonable jury could conclude that retaliation was a motivating factor in Mr. Rhoads' employment decisions.  Mr. Jones testified that he complained to Ms. Wiseman in Human Resources about Mr. Rhoads' alleged "stupid nigger" remark in mid-November 2005 and,

---

[13]Defendant asserts no other arguments concerning Mr. Jones' establishment of a prima facie case including, notably, whether certain retaliatory acts alleged by Mr. Jones (his disciplinary warnings in November 2005 and January 2006) constitute "materially adverse" actions within the Supreme Court's *Burlington Northern* decision.  By defendant's silence, the court assumes that defendant concedes that the warnings satisfy the second prong of the prima facie case requirement in the retaliation context and the court does not decide that issue.

shortly thereafter, Mr. Rhoads stated "I ought to teach you  about going to Human Resources on me."  Within days, Mr. Rhoads issued a written warning to Mr. Jones.  The January 2006 warning and ultimate discharge occurred only about two months after Mr. Rhoads' alleged comment that he "ought to teach" Mr. Jones about complaining to Human Resources.  In light of the relatively close proximity of the warnings and discharge to Mr. Jones' complaint, coupled with Mr. Rhoads' comment reflecting that he held Mr. Jones' complaint against him, a jury could reasonably infer that Mr. Rhoads was motivated by retaliatory animus when he disciplined Mr. Jones and subsequently discharged Mr. Jones.  Summary judgment, then, is denied.

### VII.   Mr. Wright's Claim for Statutory Penalties Under ERISA

Mr. Wright also asserts in the pretrial order a claim under section 1132(c) of ERISA for statutory penalties based solely on defendant's delay in providing to Mr. Wright a short-term disability claim form.  Summary judgment on this claim is appropriate, however, because claim forms are not among the information that section 1132(c) requires a plan administrator to furnish to plan participants.  *See Allinder v. Inter-City Prods. Corp. (USA)*, 152 F.3d 544, 549-50 (6th Cir. 1998) (holding that a plan participant may not invoke § 1132(c) to collect penalties from an administrator who fails to supply claim forms and noting that every court that has considered the issue has agreed) (collecting cases).

### VIII.   Plaintiffs' Claims for Punitive Damages and the *Kolstad* Defense

Finally, defendant contends that, pursuant to *Kolstad v. American Dental Ass'n*, 527 U.S.

526 (1999), it cannot be held vicariously liable for punitive damages arising out of the alleged conduct of Mr. Rhoads. *Kolstad* "bars an employer's liability for punitive damages if the manager's challenged actions were contrary to the employer's good-faith effort to comply" with federal anti-discrimination laws. *Harsco Corp. v. Renner*, 475 F.3d 1179, 1189 (10th Cir. 2007). To avail itself of *Kolstad*'s good-faith-compliance standard, defendant must at least adopt anti-discrimination policies; "make a good faith effort to educate its employees about these policies and the statutory prohibitions"; and "make good faith efforts to enforce" an anti-discrimination policy. *McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1138 (10th Cir. 2006) (citing *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1210 (10th Cir. 2000)).

While it is undisputed that defendant adopted anti-discrimination policies and made an effort to educate its employees about those policies, defendant is not entitled to summary judgment on plaintiffs' claims for punitive damages because a reasonable jury could conclude, based on the record evidence, that defendant failed to enforce, or make good faith efforts to enforce, the policies that it adopted. *See id.* Viewing the evidence in the light most favorable to plaintiffs, defendant was aware of complaints about Mr. Rhoads' alleged racial harassment (through Mr. Wright's complaints to Mssrs. Perkins and Hefflin and Mr. Jones' complaint to Ms. Wiseman) and yet failed to follow up with plaintiffs in any respect and failed to take any action whatsoever to address the alleged racial harassment. Defendant's motion is denied. *See id.* (even if an employer adduces evidence showing it maintains on paper a strong non-discrimination policy and makes good faith efforts to educate its employees about that policy, "a plaintiff may still recover punitive damages if she demonstrates the employer failed

to adequately address Title VII violations of which it was aware").

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. 36) is **granted in part and denied in part**.  Specifically, a trial is required on Mr. Wright's and Mr. Jones' racial harassment claims; Mr. Jones' discriminatory discharge, discriminatory failure-to-train and discriminatory discipline claims (limited to his August 2005 and January 2006 discriminatory warnings); Mr. Jones' retaliation claim; and plaintiffs' claims for punitive damages.  The court grants summary judgment on all other claims, including Mr. Wright's disparate treatment claims, Mr. Jones' disparate treatment claims concerning his remaining disciplinary warnings; Mr. Wright's retaliation claim; and Mr. Wright's ERISA claim.

**IT IS FURTHER ORDERED BY THE COURT THAT** plaintiffs' motion for leave to file a surreply (doc. 48) is **denied**.

**IT IS SO ORDERED.**

Dated this 11th day of April, 2008, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

27